RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MICHAEL BRAY and JAYNE BRAY, individually and natural parents and guardians on behalf of M.B., N.B., G.B., P.B.; EPIPHANY BRAY; BESEDA BRAY; PERSEVERANCE BRAY; ALETHEA BRAY; ISAAC BRAY,

*Plaintiffs-Appellants,*

*v.*

PLANNED PARENTHOOD COLUMBIA-WILLAMETTE INC., et al.,

*Defendants,*

CHRIS RILEY; JOEL KIMMET,

*Defendants-Appellees.*

No. 12-4476

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 2:10-cv-00054—Edmund A. Sargus, Jr., District Judge.

Argued: July 23, 2013

Decided and Filed: March 21, 2014

Before: ROGERS and DONALD, Circuit Judges; ANDERSON, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Thomas W. Condit, Cincinnati, Ohio, for Appellant. Richard Montague, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Thomas W. Condit, Cincinnati, Ohio, for Appellant. Richard Montague, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

_____

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  If the facts alleged in the complaint are true, this case involves an incident that is more like home raids by Red Guards during China's Cultural Revolution than like what we should expect in the United States of America.  A surprise raid was made on a judgment debtor's home to enforce an order of execution on property of the debtor.  The order was ostensibly for the purpose of obtaining property of value to be seized, but was obviously focused instead on all means for the debtor to express ideas.  The debtor was required to sit on his couch while flak-jacketed U.S. Marshals, along with agents of advocates for moral and political positions that the debtor despised, plus persons with unknown identities and purposes, went through and seized the books and papers, and computers and cameras, of the debtor and his family.  The only exception was for children's books and Bibles.  The interior of the home was videotaped.  The debtor was not allowed to leave the couch, to go outside, or to call his lawyer, although eventually a marshal called the debtor's lawyer.

This kind of home attack on the ability to convey ideas should not happen in our Republic.  It is true that the debtor's ideas—that it is moral to take violent, illegal action to stop abortions—are repugnant.  But it is contrary to our fundamental norms to permit government-sanctioned attacks on the purveyance of ideas, even when those ideas are repugnant.

Three considerations nonetheless require us to affirm the district court's dismissal of the debtor's *Bivens* action against Riley and Kimmet, the two U.S. Marshals involved.  First, notwithstanding the highly questionable way in which the court's order of execution was apparently aimed to stifle the debtor's ability to express ideas, the debtor-plaintiff in this case has not challenged the validity or scope of the judge's order.  Second, the debtor-plaintiff has settled with all of the participants in the raid other than Riley and Kimmet, so that we are faced in this case solely with the actions of marshals carrying out a presumptively valid order of a federal judge.  Third, although some of the actions allegedly carried out by the marshals and not explicitly authorized by the order were not constitutional, that unconstitutionality was not then

clearly established with sufficient specificity. Riley and Kimmet are therefore entitled to qualified immunity from suit.

Plaintiffs Michael and Jayne Bray, individually and on behalf of their minor children, along with their adult children Epiphany Bray, Beseda Bray, and Perseverance Bray, brought this action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). They allege that Deputy U.S. Marshals Chris Riley and Joel Kimmet conspired with Planned Parenthood Columbia Willamette, Inc. ("PPCW") to seize their personal property in an unconstitutional manner, ostensibly to satisfy an $850,000 judgment that PPCW had obtained against Michael Bray following the publication of his book, *A Time to Kill*.

Bray is an antiabortion activist with views that his complaint describes as "unpopular." First Amended Compl. 5. He expressed these views in *A Time to Kill*, "defend[ing] as a moral and ethical proposition the use of force to defend innocent human beings, born and unborn." *Id.* ¶ 4.3. In 1985, Bray was convicted in Maryland for a felony "relating to physical damage inflicted on several abortion centers." *Id.* ¶ 4.2. As a result, he spent four years in prison. *Id.* Despite his felony conviction and the provocative title and subject matter of his book, Bray says that he "has never advocated or encouraged anyone to kill or physically attack abortionists, nor to inflict damage on facilities where abortionists ply their trade." *Id.* ¶ 4.3.

PPCW is an Oregon corporation that performs abortions. PPCW was a plaintiff in a 1995 case in the District of Oregon, *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, in which the organization and other abortion providers sued antiabortion activists (including Bray) for intimidation by threat of force under the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248. A jury found the antiabortion activists liable to the plaintiffs for $110 million. After a lengthy appellate process, *see, e.g.*, 290 F.3d 1058 (9th Cir. 2002) (en banc), PPCW was left with an $850,000 award against Bray.

In 2005, PPCW sought to enforce and collect on this judgment by filing an action in Bray's home state of Ohio. In 2006, a district court issued a writ of execution authorizing the U.S. Marshals Service to seize specified property from Michael Bray. His wife then intervened

in the action to assert her interest in the property, delaying the execution of the writ. On July 20, 2007, the district court reactivated the writ.

Although not attached to the complaint in the present action, the district court took judicial notice of the writ that it had issued in the previous action. The writ provided:

> This writ is for the seizure of the following real and personal property located at the following address:
>
> 1.       All real property located at 308 High Street, Wilmington, OH 45177;
>
> 2.       A Compaq desktop computer in Defendant's bedroom, along with a modem or other data transmission device, a Hewlett Packard scanner, a Hewlett Packard printer, and a facsimile machine;
>
> 3.       A desktop computer located in Defendant's study, along with a data transmission device (modem) and all other associated equipment;
>
> 4.       Each and every other computer, printer, scanner, data transmission device, and all other home office equipment;
>
> 5.       An RCA-type of camcorder located in the library area of the Defendant's residence, along with any other camera or camcorder located in the library area;
>
> 6.       Two or more cameras located in the Defendant's bedroom, one digital and one thirty-five millimeter;
>
> 7.       Any other cameras or video recording devices located in the residence;
>
> 8.       All books located in the Defendant's library and throughout the remainder of the house, with the exception of children's entertainment and educational books and bibles. These books should include any and all copies of materials written by the Defendant, both in published and unpublished form;
>
> 9.       All VCR and DVD video equipment located throughout the residence, along with all televisions located throughout the residence; and
>
> 10.     All stereo equipment located throughout the residence, including both shelf and portable models.
>
> THEREFORE, YOU ARE COMMANDED to sell the above-described property of Defendant Michael Bray after giving the public notice of the time and place of the sale as required by law. You are further commanded to make out of any other property of Defendant Michael Bray subject to execution the costs of suit and the costs of executing this writ.
>
> You shall execute this writ according to its terms and according to law.

*Bray v. Planned Parenthood Columbia Willamette, Inc.*, No. 2:10-cv-054, 2011 WL 1043940, at *3 (S.D. Ohio Mar. 17, 2011). The language of this writ was taken verbatim from a proposed order filed by PPCW. A separate order issued the same day stated that "[i]f requested by the United States Marshal's Service, a representative from [PPCW] shall be present to assist in the identification of property subject to seizure."

Because the Brays understood that the seizure of their property was imminent, they had their attorney contact the U.S. Marshals Service and the attorneys for PPCW (who are with the law firm of Squire, Sanders & Dempsey) to offer assistance and cooperation to avoid a traumatic event for the Brays' young children. The Marshals Service and the attorneys "responded in a spirit of professional cooperation, but no details were discussed about the execution of the writ." First Amended Compl. ¶ 4.10. The deputy marshals allegedly involved were Joel Kimmet, Chris Riley, and Micah Stevenson.

The Brays' complaint describes the execution of the writ as follows:

> 4.11 On October 1, 2007 at approximately 10:00 a.m., with no advance notice of any kind to Mr. & Mrs. Bray or their respective counsel, Defendants Riley, Kimmet, Stevenson, one other United States Marshal and one agent from the Bureau of Alcohol, Tobacco and Firearms (ATF) appeared at the Bray home with attorneys from the Squire law firm, at least two Clinton County sheriff deputies, and other unknown people. Most or all of the U.S. Marshals and the ATF agent were carrying firearms and wearing flak jackets. Defendant Riley informed Mr. Bray that the United States Marshal Service was there to seize the Bray[s'] personal property and that the Bray family had to vacate the house within 30 days. After asking Mr. Bray if there were any guns in the house, Defendant Riley and the other marshals who were present ordered Mr. Bray to remain on a sofa in the front room of the house, denying him the right to walk about his own home and denying him the use of a telephone to call his attorney or anyone else. Eventually, Defendant Stevenson left a voice message at the office of Mr. Bray's counsel that the raid was taking place but by the time Mr. Bray's counsel retrieved the voice message and [traveled] one hour to the Bray home the raid was almost completed. Both the attorney for the Squire law firm and the Defendant U.S. Marshals refused to identify for Mr. Bray's counsel the numerous strangers who were present.

> 4.12 Meanwhile, PPCW's attorneys and those multiple strangers were given free access to walk throughout the Bray home and yard. Confined to the sofa, Mr. Bray watched as one unidentified male walked around carefully videotaping the inside of the Bray home, PPCW attorneys walked around with

clip boards, and others carried many boxes of personal property out of the Bray home. The Defendants denied Mr. Bray's request that he be permitted to verify what items were being removed from his home.

4.13 At one point Plaintiff Jayne Bray arrived home to find the Defendants and their accomplices having their way throughout the Bray home. Mrs. Bray asked Defendant Riley why the inside of her home was being videotaped by PPCW attorneys. Riley replied that the home would be taken from the Bray family in 30 days and the PPCW attorneys wanted to make sure they knew what the interior of the house looked like so that it remained in good order after Defendants left that day.

4.14 Shortly after 11:00 a.m., Plaintiff Beseda Bray arrived home from school and found herself guarded by a U.S. Marshal. Beseda Bray was required to leave her cell phone outside of the house and was then questioned by a U.S. Marshal when she attempted to go up to her bedroom to change her clothes. Defendants' treatment of Beseda Bray made her feel like a criminal in her own home. Defendants' display of firearms and their oppressive behavior throughout the Bray home made Beseda fearful for herself and for her parents and led her to weep during the ordeal.

4.14 At 12:30 p.m. Plaintiff Perseverance ("Persie") Bray arrived home from school and was confronted by a U.S. Marshal telling her that she could not go anywhere in the house. She was required to have an escort to go to the kitchen for lunch and lost her appetite for lunch as a U.S. Marshal kept watch over her. Persie Bray therefore took some water and elected to flee the house to walk on foot around the neighborhood rather than staying in the presence of the intimidating, armed federal agents. Like her sister Beseda, Persie Bray was made to feel like a criminal in her own home and broke down weeping as a result of what she witnessed.

4.15 At approximately 2:00 p.m. Defendants were prepared to leave the house with a moving truck full of boxes. They had reviewed nearly all of the papers in the Bray home before leaving, including family photo albums. Contrary to the Writ of Execution, Defendants removed from the Bray home books that Mr. Bray used to educate his children on religion, history and other subjects. Because both Mr. Bray and his counsel were deliberately cut out of the entire process, they were in no position to call that violation of the writ to Defendants' attention.

*Id.* ¶¶ 4.11–.15.

Later that month, a magistrate judge conducted an evidentiary hearing at which the Brays asserted that some of the seized property was exempt from the writ and should be returned. On November 16, 2007, the district court ordered that many of the seized items be returned to the Brays on the grounds that the materials belonged to the Bray children or to third parties, or were

otherwise exempt from seizure under Ohio law.  Over one and a half years later, on June 22, 2009, PPCW returned the items.

On September 29, 2009, the Brays filed suit in an Ohio state court against PPCW; Squire, Sanders & Dempsey; and Deputy U.S. Marshals Joel Kimmet, Chris Riley, and Micah Stevenson.  The deputy marshals removed the action to the Southern District of Ohio pursuant to the Federal Officer Removal Statute.  28 U.S.C. § 1442.

In their amended complaint, the Brays asserted two Fourth Amendment causes of action that remain relevant at this stage of the litigation: an unreasonable search of the Brays' home, and an unreasonable seizure of Michael Bray.  In particular, the Brays alleged that: (1) seven law enforcement officers arrived at their home; (2) most or all of them carried firearms and wore flak jackets; (3) the deputy marshals ordered Michael Bray to sit on the couch in his living room and did not allow him to leave for approximately four hours; (4) during that time, the marshals denied Michael Bray the use of his phone to call his attorney; (5) numerous private individuals accompanied the marshals; (6) the marshals refused to identify those individuals; and (7) one of the individuals, likely a representative of PPCW, carried a video camera and filmed the contents of the home.

The deputy marshals moved to dismiss the action based on the alternative theories of quasi-judicial absolute immunity, qualified immunity, and the lack of a *Bivens* remedy for an unconstitutional search by U.S. Marshals executing a writ.  The district court granted the motion, holding that the deputy marshals were protected by qualified immunity and by absolute quasi-judicial immunity, which "extends to persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994).  The district court reasoned that implicit in the power the magistrate judge had granted to the marshals through the writ of execution was "the authority to exercise a degree of control over both the property being seized, the location wherein the property is located, and, by extension, those present at the location." *Bray*, 2011 WL 1043940, at *4.  According to the court, the detention of Michael Bray "served reasonable and legitimate safety and operational concerns." *Id.*  Moreover, the court held, the writ merely ordered a representative of PPCW to be present if requested by the marshals, and the writ did not

limit PPCW to one representative. *Id.* at *5. Finally, the court held, the filming of the home was both reasonable and permissible, because it captured a record of the condition of the property prior to its sale. *Id.* Following the settlement and dismissal of the Brays' claims against PPCW and Squire, Sanders & Dempsey, the Brays appealed the judgment in favor of deputy marshals Kimmet and Riley.[1]

For the reasons that follow, the marshals' alleged actions violated the Brays' Fourth Amendment rights, but the marshals are nonetheless protected by qualified immunity. The Supreme Court has explicitly recognized the permissibility of such reasoning: "defining constitutional rights and only then conferring immunity . . . is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 131 S. Ct. 2020, 2032 (2011).

Because the overwhelming focus of the writ was media and communications property, the relevant constitutional analysis is particularly exacting. The Fourth Amendment originated, in part, as a safeguard for free speech, *see, e.g.*, *Stanford v. Texas*, 379 U.S. 476, 481–85 (1965), and "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (internal quotations and citations removed); *see also Walter v. United States*, 447 U.S. 649, 655 (1980); *A Quantity of Books v. Kansas*, 378 U.S. 205, 206–13 (1964); *Marcus v. Search Warrant*, 367 U.S. 717, 724–29 (1961).

Under a "scrupulous" application, the Fourth Amendment was violated by the detention of Michael Bray for four hours with no access to outside communications while armed, flak-jacketed U.S. Marshals worked with an organization Mr. Bray despised to seize his books and manuscripts (including books and manuscripts of insignificant market value) for the ostensible purpose of satisfying a debt. Reasonableness is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotations and citations omitted). A detention or search that occurs within the

---

[1]Micah Stevenson is no longer a party to this case. The Brays initially named Stevenson as a defendant, but he was never served with process.

home is subject to particular scrutiny because, among the places and things protected by the Fourth Amendment, "the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (internal quotations and citations omitted).

No countervailing governmental interest justified the four-hour detention of Michael Bray. For one thing, the raid presented none of the operational and safety concerns that may justify seizing the occupants of a home during the execution of a criminal warrant. *See, e.g., Los Angeles County v. Rettele*, 550 U.S. 609, 614–16 (2007). Allowing Michael Bray to leave his home or to use the telephone would not have threatened the completion of the search. Nor would an unrestrained Michael Bray have presented a safety concern. To the contrary, the marshals' own actions belie that argument. Had the marshals believed that not restraining Michael Bray risked violence, they would not likely have permitted numerous representatives of PPCW to join in a surprise raid of his home.

Inviting multiple representatives from PPCW to join the search did more than undermine the argument that the marshals believed Michael Bray to be a safety threat. In addition, the action violated the Fourth Amendment because it exceeded the writ, which authorized only "*a* representative from [PPCW]" to "be present to assist in the identification of property subject to seizure." First Amended Compl. ¶ 4.11 (emphasis added). Contrary to this clear instruction, the marshals permitted not one, but "numerous" representatives of the organization to join the raid. *Id.* "[T]he Fourth Amendment has drawn a firm line at the entrance to the house," and a search or seizure in the home without a warrant is "presumptively unreasonable." *Payton v. New York*, 455 U.S. 573, 586, 590 (1980).

Adding further support to the conclusion that the marshals' actions violated the Constitution, the presence of multiple unauthorized representatives of PPCW served no valid purpose under the writ. Although the Fourth Amendment does not require that all conduct by an officer within a home be expressly authorized by a court order, it does demand that actions relate to the lawful objectives of the order. *Wilson v. Layne*, 526 U.S. 603, 611 (1999). PPCW had no

articulated expertise in satisfying the ostensible purpose of the writ, identifying valuable goods to satisfy a monetary judgment.

Moreover, because the presence of additional representatives of PPCW was not authorized, and because the writ made no provision for the use of a camera, it was a violation of the Fourth Amendment to permit the organization to film the home. A person who is not lawfully present in a home may violate the Constitution by engaging in warrantless filming of the area. The Supreme Court made clear in *Wilson* that the right to be present in a home does not necessarily entitle police to bring photographers with them. *Id.* In this case, the unauthorized filming of the Brays' home was particularly unreasonable because the raid was unannounced and the filming occurred within the home itself. Moreover, because of the location and nature of the filming, the use of the camera posed a heightened risk of intimidating the family and capturing its intimate, unguarded moments.

Viewed in the light most favorable to the plaintiffs, the marshals' asserted actions add support to the argument that the ostensible goal of the raid (identifying valuable goods to satisfy a monetary judgment) served as a pretext for intimidating the Brays and identifying disfavored books and papers for confiscation. This inference is particularly strong in light of the writ's focus on expressive materials of negligible market value. For example, the writ authorized the marshals to seize "all copies of materials written by [Michael Bray], both in published *and unpublished form*." (Emphasis added.)

Expressive content cannot be targeted for confiscation, for instance under RICO, without a judicial determination that it is unlawful or otherwise intertwined with an illegal enterprise. *See Alexander v. United States*, 509 U.S. 544, 551 (1993). Similarly, when compensating the victims of a crime, it is presumptively unconstitutional to target the profits associated with publications describing that crime. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–23 (1991). Of course, the Brays have not raised these specific arguments. Nor have they challenged the underlying writ, the constitutionality of which we therefore do not address. Nonetheless, the Fourth Amendment is not read in a vacuum, and "[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden v. Kentucky*, 413 U.S. 496, 501

(1973). In light of concerns about free speech and the sanctity of the home, and for the more specific reasons identified above, the marshals' alleged actions in executing the writ were unreasonable, and they violated the Brays' rights under the Fourth Amendment.

Nonetheless, the officers are protected from suit by the doctrine of qualified immunity, because these constitutional rights were not clearly established at the time of the violations.[2] The defense of qualified immunity applies if a plaintiff fails to allege facts that make out a violation of a constitutional right that was clearly established at the time of the alleged misconduct. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012). A right is clearly established if "every reasonable officer would have understood that what he [was] doing violate[d] that right," and "existing precedent . . . placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2013).

Because the legal and factual scenario presented in this action is not identical to any the Sixth Circuit or the Supreme Court has previously addressed, the rights the marshals violated were not clearly established at the time of the alleged misconduct, and a reasonable officer could have believed that his conduct was lawful. For one thing, the prolonged detention of Michael Bray might have been permissible in the distinct but more common context of executing a warrant for criminal contraband. The Supreme Court has approved of confinement by officers of the occupants of a house to minimize the risk of bodily harm during the execution of a criminal warrant, to facilitate the orderly completion of the search, and to prevent flight and the improper disposal of evidence. *See, e.g.*, *Bailey v. United States*, 133 S. Ct. 1031, 1038–41 (2013). The right to detain in the somewhat analogous, albeit different, case of a search for contraband, is "categorical," with no relationship to the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981).

Moreover, although the Supreme Court has questioned whether detention is permissible in the context of a search for evidence other than contraband, *see id.* at 705 n. 20, the Court has not examined the Fourth Amendment implications of a search or a seizure under a civil writ of

---

[2]We need not reach the question of absolute quasi-judicial immunity.

execution. It is true, though, that our court has held in the civil judgment enforcement context that absolute quasi-judicial immunity may apply if detention is specifically authorized in a valid court order. *See Cooper v. Parish*, 203 F.3d 937, 943, 948–49 (6th Cir. 2000). Accordingly, in the absence of specific guidance to the contrary, a reasonable officer could have interpreted existing precedent to permit the detention of Michael Bray.

The marshals might also reasonably have believed that it was acceptable to invite additional representatives of PPCW to join the raid, because outside involvement in the execution of a court order is sometimes permissible. For example, in *United States v. Clouston*, 623 F.2d 485, 486–87 (6th Cir. 1980), this circuit approved assistance by a telephone company's employees in the execution of a warrant related to wiretapping, partly because the employees were present to aid in the identification of electronic devices covered by the warrant. Although here the writ of execution identified the number of PPCW representatives who were authorized to be present, a marshal might nonetheless have concluded that it was permissible to invite additional representatives of PPCW to execute the writ, because officers may sometimes seek the aid of third parties in executing court orders. Further buttressing this conclusion, the marshals' actions in seeking outside assistance were distinct from those in which this circuit has recognized a possible constitutional violation. For example, the marshals did not invite private individuals to join them *after* they had already completed a search authorized by a warrant, as occurred in *Bills v. Aseltine*, 958 F.2d 697, 702 (6th Cir. 1992).

An officer who was unaware that the additional representatives of PPCW were not authorized to be present might also have reasonably concluded that the individuals could film the home. Other circuits have assumed without deciding that videotaping the execution of a valid search warrant is lawful. *See, e.g.*, *Marks v. Clarke*, 102 F.3d 1012, 1033 n. 37 (9th Cir. 1996). In addition, several circuits have held that warrantless filming does not violate the Constitution if the cameramen are authorized to be present in the home. *See United States v. Wahchumwah*, 710 F.3d 862, 867 (9th Cir. 2013); *United States v. Brathwaite*, 458 F.3d 376, 380–81 (5th Cir. 2006); *United States v. Davis*, 326 F.3d 361, 366 (2d Cir. 2003). Although here the cameraman was not authorized to be present in the Brays' home, reasonable officers who were mistaken about the lawfulness of inviting additional representatives of PPCW to join the raid might

likewise have been mistaken about whether those representatives could film the home, particularly in light of the camera's utility in capturing the condition of the property prior to its sale.  Therefore, the rights the marshals breached were not clearly established at the time of the violations.

The judgment of the district court is AFFIRMED.