NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0391n.06

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 12, 2016
DEBORAH S. HUNT, Clerk

JOHN SAMPSON, et al.

     Plaintiffs-Appellants,

v.

LISA GEE-CRAM, et al.

     Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

_____/

**BEFORE:**    BOGGS, CLAY, and GILMAN Circuit Judges.

**CLAY, Circuit Judge.** Plaintiffs John Sampson, M.D. ("Sampson"), Cecelia Sampson, Argyle Plastic and Reconstructive Surgery, P.C. ("Argyle"), the Argyle Plastic and Reconstructive Surgery, P.C. 401(k) Profit Sharing Plan and Trust (the "Pension Fund"), and Fourth Street Properties, L.L.C. ("Fourth Street") appeal from the district court's orders dismissing their claims brought pursuant to 42 U.S.C. § 1983 against the defendant police officers and municipalities for alleged violations of Plaintiffs' Fourth Amendment rights. For the reasons set forth below, we **AFFIRM** the district court's judgment in full.

## BACKGROUND

Sampson is a physician licensed to practice medicine in the state of Michigan, and he does so through his professional corporation and co-plaintiff, Argyle. Plaintiff Cecelia Sampson is Sampson's wife and is employed by Argyle as an office manager. Sampson practices out of two different medical offices—Argyle Plastic and Reconstructive Surgery in Jackson, Michigan,

and Trillium Cosmetic Surgery Center in Okemos, Michigan. Sampson also serves as the trustee/custodian of plaintiff Pension Fund, which contains the pension deposits of past and present Argyle employees. The final plaintiff, Fourth Street, is a corporation that also appears to be under Sampson's control.[1]

In 1995 and 2004, Sampson entered into contracts with Blue Cross Blue Shield of Michigan ("BCBSM"), whereby Sampson agreed to provide medical services to BCBSM members in exchange for payment from BCBSM. In August 2009, Sampson met with representatives of BCBSM to discuss an audit of Sampson's insurance billing practices—i.e., his requests for payment from BCBSM for services rendered. On December 17, 2009, BCBSM notified Sampson that preliminary audit results revealed that he had received overpayments of at least $527,585.12. Three weeks later, Sampson received a telephone call from David Castelein, the lead BCBSM investigator involved in Sampson's audit. During that call, Sampson expressed "dismay and outrage regarding the audit," as well as his "intent to have his attorney involved." (R. 81, PageID 2538.)

On January 12, 2010—eight days after the phone call—Castelein met with one or more Jackson County assistant prosecutors and defendant Detective-Sergeant Lisa Gee-Cram ("Cram") of the Michigan State Police. At the meeting, Castelein provided Cram with a three-inch binder of information pertaining to BCBSM's investigation of Sampson. Cram spent the next two days reviewing the information in the binder and preparing an affidavit that would be used to support search warrants. According to the resulting affidavit, BCBSM's investigation and supporting documentation suggested that Sampson had exploited loopholes in BCBSM's billing procedures in order to procure reimbursement for services not covered under BCBSM's

---

[1] These persons and entities are collectively referred to herein as "Plaintiffs."

policies and for services not actually performed. BCBSM estimated that in a single year, Sampson used these methods to fraudulently procure $243,594.86.

Using that affidavit, Cram swore out warrants to search Sampson's Argyle and Trillium offices, as well as the Sampsons' residence (the "search warrants"). Cram also swore out warrants to search Plaintiffs' banks and seize "[t]he assets of any and all accounts related" to "Argyle Plastic & Reconstructive Surgery PC, Dr. John Sampson, MD, or Trillium Cosmetic Surgery Center" (the "financial warrants"). (*See, e.g.*, R. 36-9, PageID 1494.) The financial warrants were supported by affidavits largely identical to those supporting the search warrants. Although the affidavits contained estimates of the proceeds of Sampson's alleged fraudulent scheme, they contained no information establishing how such proceeds were handled by Sampson once procured.

Prior to execution of the warrants, Cram assembled a team that consisted of the five defendant law enforcement officers: Detective Robert Schrock of the Blackman Township Police Department; Detectives Tim Schlundt, Lee Rose, and Brian Russell of the Jackson County Sheriff's Department; and Trooper Gina Gettel of the Michigan State Police Department. In addition, Cram asked David Castelein for the assistance of BCBSM employees in executing the warrants. Castelein offered the assistance of himself and seven other BCBSM employees. Cram later testified that she sought the help of BCBSM employees because she had never conducted a search of a doctor's office, because Sampson's alleged abuses of BCBSM's complex billing procedures formed the basis of the criminal investigation, and because she felt that the BCBSM employees' participation would make the search more efficient and reduce the number of items seized.

The warrants were executed on January 19, 2010. That morning, Cram conducted a pre-raid briefing, during which she divided raid participants into smaller "teams" with the goal of making sure all BCBSM employees were paired with an officer. After the briefing, Det. Rose traveled to Sampson's banks to execute the financial warrants, and the remaining law enforcement officers and BCBSM employees executed the searches of the physical locations. At Sampson's offices and residence, BCBSM employees assisted by pulling patient files and searching for other documents relevant to the criminal investigation. Officers also monitored BCBSM employees as they conducted interviews of consenting Argyle employees and patients present during the raids of the offices. According to Cram, no items were actually "seized" during the raid without her final approval.

Meanwhile, Det. Rose executed a warrant to search Citizens Bank and seize the "assets of any and all accounts" related to "Argyle Plastic & Reconstructive Surgery, PC, Dr. John Sampson, and/or Trillium Cosmetic Surgery Center." (R. 36-9, PageID 1494; R. 73-1, PageID 2449.) After Rose served the warrant on bank employees, those employees searched for accounts matching the terms of the warrant; they ultimately surrendered the funds contained in seven bank accounts and one CD. Two of the accounts, on which Sampson was a signer, were held in the name of Fourth Street Properties, LLC.

These various searches and seizures spawned a series of cases in state court, including a criminal action brought against the Sampsons. On April 10, 2013, the state criminal court issued an order denying the Sampsons' motion to suppress the evidence obtained during the raids. Criminal proceedings thereafter continued until May 2013, when, in exchange for dropping all charges against the Sampsons, Argyle pleaded no contest to one count of using false pretenses

with intent to defraud of an amount between $1,000 and $20,000 in violation of Mich. Comp. Laws § 750.218(4)(a). Criminal charges are no longer pending against Plaintiffs.

On January 11, 2013, Plaintiffs filed this action in federal district court, alleging eight federal and nine state causes of action against the officers who participated in the raids, the municipalities that employed those officers, the BCBSM employees who participated in the raids, and BCBSM itself. The district court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims, leaving only the federal claims to be decided. This appeal is taken from the district court's orders granting Defendants' motions for summary judgment and dismissing four of Plaintiffs' federal claims brought against the governmental defendants only.[2] Those claims were summarized by the district court as follows:

> **"42 USC 1983 Deprivation of Rights Under Fourth, Fifth And Fourteenth Amendments Due To Seizure Of Monies Without Probable Cause" (Count I):** this count, which is asserted against Defendants Cram and Rose, alleges that the seizure of funds under the financial warrants was unlawful because the warrants were issued despite the lack of probable cause and no reasonably trained officer could have believed that the warrants contained probable cause.

> **"Deprivation Of Rights Under Fourth, Fifth And Fourteenth Amendment Due To Seizure Of LLC Funds" (Count II):** this count, which is asserted against Defendants Cram and Rose, alleges that the officers seized money from accounts belonging to Fourth Street Properties without a warrant authorizing them to do so.

> . . .

> **"42 USC 1983 Deprivation Of Rights Under Fourth Amendment Due To BCBS Participation In Execution Of Warrant" (Count V):** this count, which is asserted against Defendants Cram, Schrock, Schlundt, Russell, [and] Gettel . . . alleges that Defendants violated Plaintiffs' rights by having BCBS participate in the execution of search warrants and that participation was illegal because BCBS used the search to further its own interests.

---

[2] Plaintiffs also raised two civil conspiracy claims (Counts III and IV) against defendant officer Cram. In its order granting Cram's motion for summary judgment on those two claims, the district court concluded that the claims had been abandoned by Plaintiffs. Plaintiffs' briefing before this Court fails to present any argument on these claims, and we therefore conclude that those claims are forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

**"42 USC Failure To Train/Supervisory Liability" (Count VI):** this Count seeks to impose liability against Jackson County and Blackman Township on a failure-to-train theory of municipal liability.

(R. 98, PageID 3452.)

The district court dismissed Plaintiffs' claims against the individual officers (Counts I, II, and V) after determining that the officers were entitled to qualified immunity. Qualified immunity was found appropriate as to Count I because the officers' reliance on the financial warrants, which were signed by a magistrate, was not facially unreasonable under the Supreme Court's holding in *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012). The court found that Cram was entitled to qualified immunity as to Count II because she did not participate in the execution of that warrant; Det. Rose was likewise found entitled to such immunity because he reasonably relied on bank employees to determine which accounts fell within the scope of the warrant, and because Plaintiffs could not identify any cases clearly establishing that Rose's conduct violated the Fourth Amendment. Finally, the court granted the officers immunity as to Claim V after citing our recent decision in *Bray v. Planned Parenthood Columbia-Willamette Inc.*, 746 F.3d 229 (6th Cir. 2014), for the proposition that the law regarding the permissible extent of civilian participation in the execution of a search warrant was not "clearly established" at the time of the searches at issue.[3]

After the district court dismissed Plaintiffs' claims against the governmental defendants, the remaining parties to the litigation—Plaintiffs and the BCBSM defendants—filed a stipulation of dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Plaintiffs timely filed a notice of appeal from that stipulation of dismissal. *See Hicks v. NLO,*

---

[3] Below, Defendants Cram and Gettel also argued that the state criminal court's denial of the Sampsons' motion to suppress precludes Plaintiffs from bringing their claims regarding civilian participation in the execution of the search warrants. Like the district court below, however, we decline to address this collateral estoppel argument because we ultimately conclude that the individual officers are entitled to qualified immunity.

*Inc.*, 825 F.2d 118, 120 (6th Cir. 1987) (holding that appellate jurisdiction existed where the plaintiff appealed from a stipulated dismissal of her remaining claim after the district court dismissed all of her other claims).

## DISCUSSION

### A.    Standard of Review

We review a district court's grant of summary judgment *de novo*. *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). Where the district court has granted summary judgment on the basis of qualified immunity, we must "constru[e] the facts in the light most favorable to the party asserting the injury and draw[] all reasonable inferences in that party's favor." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016).

### B.    Qualified Immunity

Qualified immunity is intended to give "government officials breathing room to make reasonable but mistaken judgments." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). To that end, "[t]he doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). Determining whether an officer is entitled to qualified immunity thus involves two inquiries:

> First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity

protects the official from civil damages." *Brown*, 814 F.3d at 457 (citing *Pearson*, 555 U.S. at 236).

Below, the district court held that the defendant officers are entitled to qualified immunity as to all of Plaintiffs' alleged Fourth Amendment violations—i.e., the violations alleged in Counts I, II, and V. We address these Counts in turn.

### 1. Count I: the financial warrants

To reiterate, Count I asserts that Dets. Cram and Rose violated the Fourth Amendment by swearing out and executing the financial warrants because those warrants were not supported by probable cause. In granting Cram and Rose summary judgment on this Count, the district court relied on *Messerschmidt v. Millender*, 132 S. Ct. 1235. The plaintiffs in *Messerschmidt* filed a civil action alleging violation of the Fourth Amendment based on the search of their residence pursuant to a warrant that was not supported by probable cause. *Id.* at 1244. The defendant officers, however, had obtained approval for the challenged warrant from a superior officer, a deputy district attorney, and ultimately the magistrate who signed the warrant. *Id.* at 1249. The Supreme Court held that although the warrant was ultimately found invalid, the officers were entitled to qualified immunity. *Id.* at 1250–51. In so doing, the Court opined: "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner," thus entitling those officers to qualified immunity. *Id.* at 1245.

Nevertheless, the Court in *Messerschmidt* recognized that "[t]he 'shield of immunity' otherwise conferred by the warrant will be lost . . . where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable.'" *Id.* at 1245 (internal citation omitted) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). But "the threshold for establishing this exception is a high one." *Id.*

> [I]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.

*Id.* (internal brackets and quotation marks omitted).

As an example of an instance in which officers would not be entitled to qualified immunity despite relying on a warrant signed by a magistrate, the Court cited *Groh v. Ramirez*, 540 U.S. 551 (2004). *See Messerschmidt*, 132 S. Ct. at 1250. In *Groh*, the challenged warrant authorizing the search of the suspect's home was based on an alleged stockpile of illegal firearms allegedly located therein, but the warrant described the suspect's house itself as the "person or property to be seized." 540 U.S. at 554 (internal quotation marks omitted). The officers could not reasonably rely on that warrant, the Court held, because it contained a "glaring deficiency" that even "just a simple glance" would have revealed. *Messerschmidt*, 132 S. Ct. at 1250. The Court in *Messerschmidt* distinguished *Groh*, holding that deficiencies in a warrant are not sufficiently "glaring" when they "would have become apparent only upon a close parsing of the warrant application, and a comparison of the affidavit to the terms of the warrant to determine whether the affidavit established probable cause to search for all the items listed in the warrant." *Id.*

Plaintiffs apparently concede that *Messerschmidt* supplies the relevant analysis for Count I, but argue that by granting qualified immunity to Cram and Rose, the district court afforded those officers a "greater benefit of the doubt than was even contemplated by the court in *Messerschmidt*." (Pls.' Br. at 24.) We disagree. The affidavit supporting the financial warrants contained evidence of a sophisticated, years-long, and lucrative conspiracy to defraud BCBSM.

Such evidence made it reasonable for Cram and Rose to assume that the bank accounts described in the financial warrants—that is, those "related to" Sampson and Argyle—were likely to contain the proceeds of the alleged conspiracy. Under these circumstances, Cram and Rose were not "plainly incompetent," *see id.* at 1244, for believing that the magistrate-approved financial warrants justified seizure of the bank accounts.

Moreover, Plaintiffs cannot point to any defect in the financial warrants that was "glaring" in a way comparable to the defect at issue in *Groh*. Rather, the facts of this case more closely approximate those of *Messerschmidt*, in which potential defects in the warrant "would have become apparent only upon a close parsing of the warrant application." *Id.* at 1250. Thus, we disagree with Plaintiffs that the district court misapplied *Messerschmidt*, and we affirm the court's grant of summary judgment to Cram and Rose as to Count I.

### 2. Count II: execution of the financial warrants and seizure of accounts belonging to Fourth Street

In Count II, Plaintiffs argue that Cram and Rose violated the Fourth Amendment by seizing accounts held by Fourth Street, which was not explicitly identified in the financial warrants as an entity whose accounts were to be seized. Under our case law, however, "a search does not become invalid merely because some items not covered by a warrant are seized. Rather, an otherwise valid search becomes an impermissible general search only where the searching officers demonstrate a flagrant disregard for the limitations of a search warrant." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 602 (6th Cir. 2012). Here, the financial warrants authorized the seizure of "any and all accounts related" to "Dr. John Sampson, MD." Bank employees determined that Fourth Street's accounts fit that description because Sampson was a signer on the accounts. Under these circumstances, we cannot say that Cram or Rose exhibited a

"flagrant disregard for the limitations of the search warrant" by seizing Fourth Street's accounts. *See id.* Those officers are therefore entitled to qualified immunity on this Count.

### 3. Count V: civilian participation in the execution of the search warrants

In Count V, Plaintiffs argue that the individual officers who executed the search warrants violated Plaintiffs' Fourth Amendment rights by allowing BCBSM employees to participate in the raids. Below, the district court held that the officers are entitled to qualified immunity on this Count because our holding in *Bray v. Planned Parenthood Columbia-Willamette Inc.*, 746 F.3d 229 (6th Cir. 2014), suggests that the constitutionally permissible extent of civilian participation in the execution of a warrant was not clearly established at the time of the raids in this case.

On appeal, Plaintiffs assert that the district court misinterpreted their argument: the court incorrectly "presum[ed] that the BCBSM representatives' participation in the raids was to 'assist' the officers in a law enforcement purpose" (Pls.' Br. at 18), and that Plaintiffs' claim concerned the permissible extent of such participation. Plaintiffs state that their real argument is (and was) "that the warrants were obtained by defendant Gee-Cram to provide [BCBSM with] access to the Plaintiffs' premises, and bank accounts and thereafter the BCBSM representatives actually conducted the raids while the law enforcement officers were little more than observers." (*Id.*) Under this understanding of the facts, Plaintiffs argue, the unconstitutionality of the defendant officers' actions was clear under existing cases—namely, *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992), and *Wilson v. Layne*, 526 U.S. 603 (1999).

In *Bills*, the defendant police officer invited a civilian into a residence that was the subject of a search warrant. 958 F.2d at 702. The officer had already finished executing the warrant and had located the warrant's target—an allegedly stolen generator. *Id.* The civilian was not interested in the generator; rather, he was looking for other items in the residence that

may have been stolen from his employer. *Id.* We held that under these facts, it was "undisputed that [the civilian] was not on the premises for the purpose of the search warrant." *Id.* In other words, "[the civilian] was present, not in aid of the officers or their mission, but for his own purposes involving the recovery of stolen . . . property not mentioned in any warrant." *Id.* In holding that these facts established a violation of the Fourth Amendment, we stated: "Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant, and not for some other purpose, the bounds of reasonableness have not been overstepped." *Id.* at 706 (citing *United States v. Clouston*, 623 F.2d 485 (6th Cir. 1980)); *see also Stack v. Killian*, 96 F.3d 159, 162–63 (6th Cir. 1996) (reaffirming *Bills*'s holding).

Similarly, in *Wilson*, officers invited newspaper reporters to join them in the execution of arrest warrants at a suspect's residence. 526 U.S. at 607. The reporters were not there to assist the officers, but "were working on a story for their own purposes . . . as evidenced in part by the fact that the newspaper and not the police retained the photographs" taken by the reporters inside the suspect's home. *Id.* at 613. On the basis of these facts, the Supreme Court held

> that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant.

*Id.* at 614.

We agree with Plaintiffs that *Bills* and *Wilson* clearly establish that officers may not permit or facilitate civilian participation in the execution of a warrant unless such participation is "in aid of" the warrant. *Bills*, 958 F.2d at 703–04 (concluding that "[t]he critical question . . . is whether the police officers engaged in any constitutionally unreasonable act in permitting or facilitating" the private party's participation in the execution of the warrant). The critical question in this case, therefore, is whether the evidence in the record creates a dispute of fact as

to whether the defendant officers permitted or facilitated the BCBSM employees' participation in the raids for some purpose other than aiding in the execution of the warrants. We conclude that no such dispute exists.

As noted in Plaintiff's own statement of undisputed facts, Cram testified that she requested assistance from BCBSM employees in order to facilitate execution of the warrants. Although Plaintiffs assert that this "self-serving" testimony is disputed, they point to no evidence—other than their own conclusory assertions—supporting an inference that the officers permitted or facilitated BCBSM's participation for purposes wholly unrelated to the warrant. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."). In other words, nothing in the record leads us to believe that the actions taken by the BCBSM employees during the raid were so divorced from the purposes of the warrant that they were analogous to the private parties' actions in *Bills* or *Wilson*. This is not, for example, a case where private parties entered Plaintiffs' offices only after law enforcement's search had concluded, seeking items completely unconnected to the purposes of the warrant. *See Bills*, 958 F.2d at 702.

Certainly, Plaintiffs' facts and allegations suggest that the BCBSM employees may have been acting in their own self-interest while participating in the raid. But "[t]his is a civil action for damages against . . . police officers and their employers, and the question is whether *those* defendants committed acts that resulted in a constitutionally unreasonable intrusion into [Plaintiffs' offices and residence]." *Bills*, 958 F.2d at 703 (emphasis in original). Nothing in *Bills* or *Wilson* suggests that the mere existence of some self-interest on the part of the BCBSM employees rendered the defendant officers' actions unconstitutional. To the extent Plaintiffs

argue otherwise, their arguments fall outside the boundaries of the law clearly established by those cases.[4]   We therefore conclude that the individual officers are entitled to qualified immunity as to Count V.

## C.       Plaintiffs' claims against the municipal defendants

Finally, in Count VI of their complaint, Plaintiffs allege that defendants Jackson County and Blackman Township are liable under *Monell* for their failure to train the defendant officers regarding the proper supervision of private party participants during a raid or a seizure of bank accounts.   However, because we conclude that the individual officers did not commit any underlying constitutional violations, Plaintiffs' municipal claims are foreclosed.  *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in full.

---

[4] We note here that one aspect of Plaintiffs' argument—"that the warrants were obtained by defendant Gee-Cram to provide [BCBSM with] access to the Plaintiffs' premises" (Pls.' Br. at 18)—is not germane to *Bills*'s and *Wilson*'s holdings, insofar as those cases did not involve accusations that officers obtained the warrants for illegitimate purposes.  Rather, this argument is more appropriately addressed to a claim for abuse of process, which generally involves an allegation that officers perverted a legitimate legal process to achieve a purpose that the process was not intended to effect.  *See, e.g.*, *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 676 (6th Cir. 2005) (noting that this Circuit has not yet held whether a federal cause of action exists for abuse of process under 42 U.S.C. § 1983).